UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA,              )
                                       )
              Plaintiff,               )
                                       )
v.                                     )          No. 1:22-cr-97-CEA-SKL
                                       )
JOSEPH HINNARD,                        )
                                       )
              Defendant.               )

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Defendant Joseph Hinnard ("Defendant")

[Doc. 15].   Defendant seeks to suppress all evidence arising from his stop on June 12, 2021.

Plaintiff United States of America ("Government") filed a response in opposition to the motion

[Doc. 18].[1]   For the reasons addressed below, I recommend that Defendant's motion to suppress

be denied in part and granted in part.

## I.    FACTUAL BACKGROUND

The Government called the Chattanooga Police Department ("CPD") arresting officer,

Phillip Spain ("Spain"), as its sole witness.   Defendant called no witnesses.

On June 12, 2021, Spain had been with the CPD as a neighborhood policing officer for

about a year, he had a bachelor's degree in criminal justice, and he had law enforcement training.

Prior to June 12, he had not conducted an investigation for driving under the influence ("DUI").

---

[1] Pursuant to 28 U.S.C. § 636(b), the motion to suppress was referred for a report and
recommendation by standing order.   An evidentiary hearing on the motion was held on November
1, 2022.   Prior to the hearing, Defendant filed an amended memorandum [Doc. 20] and a reply
[Doc. 21], and the Government filed a supplemental response in opposition [Doc. 19]. Post-hearing
briefs were also submitted and considered [Doc. 26, Doc. 29 & Doc. 30]. This matter is now ripe.

The parties essentially agree on the following facts: An anonymous report came into the CPD on June 12, 2021, around 7:55 p.m., reporting that a man was possibly passed out in a silver Malibu in a Walmart parking lot. As a result, Spain, an ambulance, and a firetruck were dispatched to the Walmart. As part of his normal duties, Spain was to determine if the person was unconscious due to death, medical emergency, intoxication, or some other reason. Spain raced to the Walmart with his lights and siren activated due to the reported condition of the man as being unconscious. Spain arrived first and found the silver Malibu. The vehicle was improperly parked across two parking spaces and running.

Spain was wearing a body camera and the pertinent events are recorded. The audio and video body camera recording, which starts a few minutes before 8:00 p.m., includes a continuous time clock. Various clips of the recording were entered into evidence. While the parties agree the recorded time stamps and events described below are generally accurate, they do not agree with each other's characterizations of certain events shown on the video. Where pertinent to the motion, I will address the differences with factual findings.

Based on the testimony, recording, and other exhibits, the following are my findings:

| | |
|---|---|
| 19:56:04 | Spain arrives on the scene and takes a few moments to locate the reported vehicle. |
| 19:56:08 | Spain exits his patrol car and walks to the driver's side of Defendant's vehicle. |
| 19:56:15 | Spain knocks on the driver's window a couple times, twice. Spain testified he did so to see if Defendant was just sleeping. Defendant did not respond to Spain's knocking. In Spain's experience, if Defendant had been merely sleeping, he would have responded to the window knocks. |
| 19:56:22 | Spain opens the driver's side door of the vehicle to check on Defendant. When Spain opened the door, Defendant did not wake up. Spain credibly testified that he could see Defendant had an unlit cigarette hanging in his mouth, a lot of loose money in multiple denominations and a Nike bag in his lap and hands, an aluminum foil packet or ball in the door handle and a |

2

blowtorch lighter in the center console cupholder. Spain testified he could see something yellow in the cracks of the foil, but the observation of yellow is not mentioned on the recording or in Spain's reports. Spain instantly thought these observations were indicative of drug use or possession, and of Defendant being under the influence of drugs while operating a vehicle.

19:56:21     After these quick observations, Spain verbally rouses Defendant saying, "Hey. Doin' alright?"

19:56:23     Defendant wakes and says, "Yeah." He starts putting money away and takes his sunglasses off (Spain incorrectly testified the sunglasses were removed a few moments later when Defendant got out of the vehicle, but clearly it happened when Defendant was still in the vehicle). Spain takes the unlit cigarette from his mouth. Spain concluded Defendant awoke in a state of confusion with slurred and raspy speech. Defendant argues against this characterization.

19:56:26     Spain communicates with dispatch, which is documented as "PT passed out – OS now awake and alert." (Defendant's Exhibit 3). The parties disagree what Spain meant by "awake and alert." Spain testified by "awake" he meant that Defendant was no longer passed out and by "alert" he meant that Defendant was responding to Spain's questions. Defendant contends the use of the word "alert" is evidence that he showed no signs of intoxication. Spain testified, however, that he found Defendant's responses were not fully understandable because Defendant was mumbling and had slurred and raspy speech. It was a loud and windy day and the verbal responses by Defendant cannot always be heard or understood merely by listening to the recording. I find Spain credibly testified that he did not think Defendant was alert enough to legally drive.

19:56:34     Spain says, "You good?" Defendant responds, "Yeah I'm good."

19:56:36     Spain asks, "Why you passed out, out here?" Notably, Spain did not ask Defendant why he was "asleep."

19:56:45     Defendant responds but it cannot be heard clearly on the tape.

19:56:52     Spain says, "Why don't you turn the vehicle off and step out for a minute alright?"

19:56:57     Defendant immediately complies and gets out of the vehicle.

19:57:02     Spain asks, "You ain't got nothing on you do you?"

19:57.02     Defendant states, "I was gonna get my lighter."

3

| 19:57:06 | Spain places Defendant against the vehicle and performs a quick pat down while questioning him.   Nothing is found during the pat down.[2] |
|---|---|
| 19:57:18 | Spain asks, "You ain't got anything I should know about in there do you? Got anything in there (referring to Defendant's vehicle) that I should know about?" |
| 19:57:28 | An ambulance pulls up.   Defendant says he does not need an ambulance and Spain dismisses it. |
| 19:57:34 | Spain asks Defendant, "You are taking anything?" |
| 19:57:35 | A fire department vehicle pulls up and it is also dismissed by Spain with a thumbs up sign. |
| 19:57:40 | Defendant responds, "No." |
| 19:57:56 | According to Spain, Defendant, who still has a cigarette, says something about a cigarette or lighter, but when Spain makes a move toward the car to get whatever is requested, Defendant says he does not want it.   Spain thought this was an indication that Defendant did not want Spain in the vehicle.   Again, Defendant argues against this characterization. |
| 19:57:58 | Defendant's car door has remained opened because Spain in standing in front of it. |
| 19:58:06 | Spain asks, "What's this?" as he seizes the ball of aluminum foil from the driver's side door handle. Defendant attacks Spain's credibility, but he did not successfully challenge that the foil ball and torch-lighter were in plain view in the vehicle. |
| 19:58:11 | Defendant responds, "Aluminum foil, aluminum foil." |

---

[2] Defendant initially argued the pat down was an illegal search, but seemed to abandon this argument because no evidence was located during the pat down.   Instead, Defendant argued it was part of Spain's attempt to develop probable cause and indicated Spain's subjective intent. Spain's testimony did not point to specific and articulable facts from which Spain concluded Defendant might be armed and present a risk of harm to justify the pat down,   however, no evidence was detected during the quick pat down.   While no evidence was presented to suggest the pat down was a constitutional frisk, *Knowles v. Iowa*, 525 U.S. 113, 117-119 (1998) (holing that unless an officer can point to specific facts that demonstrate reasonable suspicion that the individual is armed and dangerous, the Fourth Amendment does not tolerate a frisk), as there is also no evidence to suppress from the pat down, there is no need for the Court to address it further in my view.

During the hearing, Spain admitted that as soon as Defendant got out of the car, Spain was no longer checking on Defendant's welfare; instead, Spain was conducting an investigation, Defendant was detained, and Spain "knew" he was going to arrest Defendant for "suspicion of DUI and possibly narcotic use" based on his above-described observations. Spain testified that he knew from his training and experience that users of illegal drugs often carry and heat their drugs in packets of aluminum foil, and that they frequently use torch-style lighters to heat illegal drugs before ingesting them. While this stop was his first DUI investigation, prior to this stop Spain had seen similar torch lighters and foil packets in five other situations involving illegal drugs. Based on his training and experience, Spain concluded he had probable cause to arrest Defendant for DUI/narcotic use and to open the foil ball as part of a vehicle search. In contrast, Defendant argues Spain unwrapped the ball of aluminum in order to *develop* probable cause.

Spain admitted there are legitimate potential uses for the items he concluded were indicative of narcotic use (i.e., the money, foil, and lighter), and that the yellow he observed through the cracks of the foil could have been mustard. However, based on his training and experience, Spain concluded his observations were indications of illegal drug usage. In contrast, Defendant disputes Spain had probable cause for a vehicle search at this point and argues Spain's version of the following events is concocted.

Spain contends that, once Defendant was out of the vehicle, he also observed Defendant was swaying on his feet, that he was not making complete sense with his responses, and that his eyes were glassy/glossy and his pupils were constricted. Spain testified he is not an eye expert and, as such, could not testify whether the sunlight may have caused Defendant's pupils to constrict. Spain's observations of Defendant's swaying, eyes, and speech added to his conclusion that Defendant was, or had recently been, intoxicated from narcotics and added to his probable

5

cause for the vehicle search for narcotics.   Spain further testified that he did not believe Defendant was under the influence of alcohol because he saw no evidence of alcohol; he only saw evidence of narcotics.   Spain testified he did not conduct field sobriety tests for Defendant's safety and because such tests were unnecessary given his other observations.

Defendant disputes Spain's characterization of his eyes, swaying, and responses and claims the video and Spain's decision to leave Defendant standing unassisted belies Spain's testimony. Spain agreed the video, which I find is difficult to understand over the wind at times and is not directly trained on Defendant at all pertinent times, does not show the swaying.   Defendant also relies on the fact that field sobriety checks were not performed by Spain or subsequently arriving officers, including CPD's DUI[3]  and drug recognition officer, Jeff Buckner ("Buckner"), to dispute Spain's testimony.

The mostly agreed timeline continues:

| | |
|---|---|
| 19:58:14 | Spain peels the packet of foil open and sees four yellow pills. |
| 19:58:19 | Defendant sees the pills and says, "aw hell, dirty f*cking b**ch," a few times. |
| 19:58:26 | Spain rolls up the foil ball and puts it back in the door. |
| 19:58:33 | Spain closes Defendant's car door. |
| 19:58:48 | Defendant is taken by the arm and led to the patrol car and handcuffed with his hands behind his back. |
| 20:00:07 | While walking to the patrol car Spain asks Defendant, "What uhh, what is that?" |
| 20:00:08 | Defendant responds, "Xanax bars."[4]   Soon thereafter, a vehicle search begins.   Defendant remains handcuffed leaning against the patrol car for |

_____

[3] Referring to Tenn. Code Ann. § 55-10-401 (hereinafter referred to as the "DUI Statute" or "DUI").

[4] The Government concedes this statement should be suppressed.

6

about the next 11.5 minutes. Defendant argues this shows he was steady on his feet and belies Spain's characterization he was showing signs of intoxication, such as swaying.

20:01:58    Three other officers—Buckner, Sergeant Christopher Selman ("Selman"), and a 21-year veteran of the CPD—arrive at some point. Spain tells another officer(s), "He was passed out in the driver's seat, vehicle on, feet up and everything and then I knocked on the window, woke up, and, or I opened the door to wake him up, he woke up, and uhh I noticed there was a, he had a large amount of money, it's still in there in the passenger seat, he has a large amount of money out, money in his, when he was passed out, money was in his hand, I seen a blowtorch . . . , you know and then all of a sudden I look over in the side of the door and there's an aluminum foil and . . . ."

20:02:30    A 21-year veteran officer responds, "OK, you didn't touch any powder, cause I don't want to Narcan you, I will, I'll Narcan you in a heartbeat, don't think."

20:02:36    Spain says, "I didn't touch it, but he, he admitted they were, they were Xanax, Xanax bars, uhh wrapped up in aluminum foil."

20:08:25    Spain puts Defendant's wallet, cellphone, money, and other belongings on the hood of the patrol car where Defendant remains standing.

Spain then has a conversation with Selman, who is his supervising sergeant. Spain characterizes the conversation as mentoring/training because he had been on the job about a year, and, as previously noted, it was Spain's first DUI. It is the following conversation that Defendant argues shows that the search of the aluminum foil had nothing to do with DUI, that the idea to charge Defendant with DUI came after the fact from Selman, and that Spain adopted the DUI idea as a coached strategy to cover his lack of probable cause when he opened the foil ball.

20:08:44-
20:09:33    Spain tell Selman, "So when I showed up here, he was passed out in the seat. I knock on the window, he don't wake up. So I check to see if the door was unlocked. It was, so I opened it. I say, 'Hey man, you alright.' He woke up. I seen a large amount of money on the side, he had money in his hand while he was asleep. I seen a blow torch on the center console, and then, there was a baggie or an aluminum foil wrapped up in the side of his door. And, so I said, 'What's going on?' He seemed out of it. So I got him out. I got the aluminum foil. It contained, Xanax, Xanax bars.

7

|  | And there, there's a baggie, I don't know what it is, it looks like crystal, so . . . ." |
|---|---|
| 20:09:33 | Selman says, "Go ahead and put him in the back of the car." Spain puts Defendant in the back of the patrol car, only saying, "it's cool in the car." |
| 20:10:29 | After Defendant is put into the car, Selman then says, "Uh okay, you got plenty to hook him up on. You could charge him with DUI, I mean he was in control of the vehicle . . . . You could articulate that you couldn't get a field sobriety test cause he was so zoned out, he may've fall and hurt himself or something like that. So . . . ." |
| 20:10:43 | Spain says, "Yeah cause his pupils were dilated." Selman responds, "Yeah." Spain then says, "They were pencil thin." |
| 20:10:48 | Selman says, "Yeah, I don't know if it will float, you can work it. I don't know how the court's working them nowadays. But you can charge him with possession, and uhh, if nothing else, what was your original call, passed out motorist or something?" |
| 20:11:03 | Spain says, "Unconscious person." Selman repeats, "Unconscious person." |
| 20:11:08 | Spain says, "Uhhm, I don't know the, if it's a hundred percent crystal, he already admitted that it was Xanax bars, uhh I think there's like 4 or 5 of those, but wondering would, Buckner be able to (inaudible) let me know what's . . . [seems to be asking about the identification of the drugs found in vehicle]." |
| 20:11:21 | Selman says, "We'll take a look at it." |

The more-or-less agreed-upon timeline continues:

| 22:12:29-20:21:50 | A Nike bag, which had been on Defendant's lap when Spain opened the door, was searched and 12 individual bags of suspected methamphetamine (which were later determined to each weigh about 32 grams; slightly more than an ounce per bag and confirmed by laboratory analysis to total 303 grams of 100%-pure methamphetamine) were found. A 22-caliber pistol with a loaded magazine was found by officers behind the radio in the dashboard. Drug paraphernalia, including a methamphetamine pipe, syringe, and straw, were also found in the vehicle search. Spain thought close to $4,000 was in Defendant's lap/vehicle (the Government indicates it was determined to be more than $5,000 in total). |

8

| 20:38:05 | Defendant, who is still sitting in the patrol car, is for the first time advised he is under arrest. |
|---|---|
| 20:38:25 | Defendant is given Miranda warnings, waives his Miranda rights, and then voluntarily makes statements. Defendant does not dispute this. |
| 20:39:14 | An officer asks Defendant, "What kind of drugs did you do to pass out in the car?" Defendant replies, "I don't know, I was with them girls, dude, and next thing I know I was at their house and I woke up here. He (nodding his head toward Spain) woke me up." |
| 20:43:43 | Defendant states, "I was so f**ked-up last night with these girls . . . ."[5] |

As pertinent, on cross examination, Spain acknowledged he did not know the details of the actual flame (color, size, or heat intensity) that the torch lighter produced because he did not strike the lighter. Spain also admitted he did not observe any narcotics in the vehicle before the search. Likewise, Spain acknowledged certain movements that he observed Defendant make were not indicators of intoxication. Specifically, he testified:

> Q. And do you agree that he displayed the kind of things that you would expect someone who had just woken up from sleep would -- would show? Stretching? Raising their back? Doing their shoulders? Those kind of things. Do you see that in the video?
>
> A. Yes, I see that in the video.
>
> Q. All right.
>
> A. But that's not an indicator of impairment to me.

[Doc. 25 at Page ID # 389-90].

Additional testimony was elicited during the hearing, but it is not necessary to summarize

---

[5] While not relevant to what Spain knew when he searched the foil ball, Defendant later consented to a blood test and, according to the toxicology report, Defendant's blood contained fentanyl, alprazolam (Xanax), methamphetamine, amphetamine, and benzoylecgonine, which the Government states is the major metabolite of cocaine. Defendant reportedly was charged in state court with drug and firearm charges in addition to DUI.

9

the extensive testimony in greater detail herein. During the hearing, the following exhibits were entered into evidence by the Government: screen shots from and the video/audio recording of the stop (Government's Exhibits 1-3B), clips from and the video/audio recording of the stop (Government's Exhibits 2-6), and a toxicology report from Defendant's blood test (Government's Exhibit 7). Also during the hearing, the following exhibits were entered into evidence by Defendant: five clips from and the video/audio recording of the stop (Defendant's Exhibit 1), CPD Incident Report (Defendant's Exhibit 2),[6] Computer Assisted Dispatch Incident Detail Report ("CAD") (Defendant's Exhibit 3),[7] the CPD Uniform Arrest Report Affidavit of Complaint

---

[6] Defendant complains that, after consulting with Selman, Spain used routine boilerplate in his CPD Incident Report to claim: "Upon arrival, the police drove around the automotive side of Walmart, but didn't locate the vehicle. Police drove through the front parking lot of Walmart and noticed a Silver Chevy Malibu parked in the middle of the parking lot crooked. Police pulled up beside the Malibu and notice a male party passed out in the driver seat with money in his hands while the vehicle was running. Police knocked on the window, but the male party was not responding. Police checked the driver's side door handle to see if it was unlocked, which in fact it was unlocked. Police opened the door to check the status of the male party, which the male finally woke up in a state of confusion. Police advised the male to 'shut off his vehicle and step out for mine and his safety.' Police noticed a large amount of money dispersed on the passenger seat, a big torch lighter in the center console, a pocketknife, and seemed disoriented and confused, could hardly stand up, had glossy eyes, and his pupils were constricted. Due to these factors, police detained the male party and identified him as [Defendant]. Police inspected the ball of aluminum foil in the driver side door and found 4 yellow Xanax pills . . . ." [Doc. 21 at Page ID # 71 (quoting Defendant's Exhibit 2, filed as Doc. 21-1)]. Defendant focuses on the reference to the foil ball in the report, arguing it is out-of-sequence, and on Spain's testimony that his incident report recorded the facts he believed were relevant to the prosecution of Defendant, yet the incident report does not record that Spain saw something yellow in the ball of foil before opening it.

[7] The CAD indicates Spain arrived in response to a call that a man in a car fitting the description of Defendant's vehicle was "POSS PASSED OUT." It also contains references to a narcotics violation. Again, Defendant complains the CAD does not mention a DUI offense, just a narcotics violation.

(Defendant's Exhibit 4),[8] and a portion of the CPD Policy Manual regarding arrest procedures (Defendant's Exhibit 6).[9] Defendant argues the narratives in Exhibits 2-4 suggest Defendant's arrest occurred before the search of the ball of foil to develop probable cause, and the first mention of DUI did not occur until after Spain's coaching by Selman.

Defendant is charged in this case with possession with intent to distribute 50 grams or more of methamphetamine (actual) in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) (count one), possession of a firearm and ammunition knowing he had previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) (count two), and possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A)(i) (count three) [Doc. 1].

## II.    STANDARDS

### A.  Fourth Amendment

Most of Defendant's arguments are based on alleged violations of the Fourth Amendment to the United States Constitution, which guarantees "[t]he right of the people to be secure in their persons [and] houses . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment guards against unreasonable searches and seizures.[10] U.S. Const.

---

[8] Defendant emphasizes the Affidavit of Complaint says Defendant was detained because "this male party had a hard time standing, seemed disoriented and confused, could hardly stand up, had glossy eyes, and his pupils were constricted. Due to these factors, the police detained the male party." Again, Defendant questions why DUI is not mentioned. Defendant also argues the report is not credible because the recording shows the ball of foil was not opened until after the pat down and because Defendant was not detained until after the foil ball was opened [Doc. 21 at Page ID # 72-73 (quoting Defendant's Exhibit 4, filed as Doc. 21-3)].

[9] Defendant decided not to admit Defendant's Exhibit 5, which was a portion of the CPD Policy Manual addressing inventory searches.

[10] A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). As a preliminary matter, the Government does not contest that Defendant had a legitimate expectation of privacy with respect to all issues raised in his motion.

amend. IV; *Elkins v. United States*, 364 U.S. 206, 222 (1960) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.").  Warrantless seizures fail constitutional muster unless they qualify under one of several well-defined exceptions.  *Katz v. United States*, 389 U.S. 347, 357 (1967).

Generally, there are three types of permissible encounters between police and citizens: "(1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry*[11] stop which must be predicated upon reasonable suspicion; and (3) arrests which must be based upon probable cause."  *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009).   All seizures—including brief investigatory stops—receive Fourth Amendment protection.  *See United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)).

Generally, if a search or seizure is not conducted in compliance with the Fourth Amendment, all evidence obtained as a result of the search or seizure must be suppressed.  *See United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) ("[E]vidence and statements obtained from [an] illegality must be excluded as 'fruit of the poisonous tree.'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963))).   This remedy of evidence exclusion is a "judicial innovation," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), to be used as a "last resort, not [a] first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

Defendant, as the proponent of the motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated by a challenged search or seizure.  *See*

---

[11] *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

*Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citations omitted). It is the Government's burden, however, to demonstrate by a preponderance of the evidence that a particular search or seizure is constitutional. *See United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004) (citing *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)).

### B. Fifth Amendment

Defendant also claims a violation of the Fifth Amendment to the United States Constitution, which protects a person from being compelled to incriminate himself. U.S. Const. amend. V. A suspect who is in police custody and subject to interrogation must be given Miranda warnings[12] against self-incrimination; if no Miranda warnings are given, then the incriminating statements elicited cannot be admitted at trial. *Dickerson v. United States*, 530 U.S. 428, 431 (2000). The Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution also require that a statement or confession be voluntary to be admitted into evidence. *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004); *Dickerson*, 530 U.S. at 433.

The government bears the burden to prove by a preponderance of the evidence that, prior to custodial interrogation, a defendant was given his Miranda rights, that he voluntarily and intelligently waived his Miranda rights, and that his confession or statements were made voluntarily. *Seibert*, 542 U.S. at 608 n.1; *United States v. Ray*, 803 F.3d 244, 269-70 (6th Cir. 2015). A statement is voluntary if the defendant's will is not "overborne" by the circumstances surrounding the confession. *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

---

[12] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted into evidence.

If an individual in custody and subject to police interrogation is not given Miranda warnings, the issue of voluntariness is never reached. If an individual in custody makes unwarned statements in response to interrogation, such statements must be suppressed.[13] *Dickerson,* 530 U.S. at 443-44 (holding Miranda warnings are constitutionally required before the government can admit into its case-in-chief statements made during custodial interrogation); *Tolliver v. Sheets*, 594 F.3d 900, 917 (6th Cir. 2010) ("In 2000, the [*Dickerson*] Court reaffirmed the rule that the prosecution may not use statements obtained through custodial interrogation in the absence of the specific rendering of the Miranda warning.").

### C. DUI Statute

Tennessee's law prohibiting driving under the influence provides:

> **§ 55-10-401. Driving or in physical control of motor driven vehicle; under influence of substance affecting ability to drive; alcohol concentration**
>
> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park, or apartment house complex, or any other premises that is generally frequented by the public at large, while:
>
> (1) Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess; . . . .

Tenn. Code Ann. § 55-10-401.

---

[13] Exceptions to this rule have not been argued in this case.

14

## III. ANALYSIS

Defendant moves to suppress all physical evidence and his incriminating statements, claiming law enforcement violated his rights under the Fourth Amendment and the Fifth Amendment. While he initially grouped his argument about the constitutionality of Spain's actions into the following categories: (1) the stop and frisk; (2) the seizure and search; and (3) the duration of the stop; he now solely argues that Spain did not have probable cause to search his vehicle before Spain opened the ball of aluminum foil so the warrantless search violated the Fourth Amendment [Doc. 29 at Page ID # 460]. The crux of Defendant's Fourth Amendment argument is that Spain did not have probable cause because Spain had only observed Defendant sleeping, not passed out, and had no other direct observations of drugs or intoxicated behavior. He argues the ball of foil was closed and no drugs were visible in the foil or in the vehicle. Likewise, he argues no gun or drug paraphernalia was visible in the vehicle. Defendant argues that, at the time Spain opened the foil, Spain's observations were insufficient to constitute probable cause to believe that Defendant's vehicle contained evidence of a crime.

As to Spain's testimony that Defendant exhibited signs of intoxication such as glassy/glossy eyes, swaying, and jumbled speech, Defendant disputes Spain's credibility and claims that when he was awakened by Spain, he was "alert" as reported by Spain on the CAD. He argues he was not confused or unsteady because, if he had been, then field sobriety tests would have been conducted. He also notes that no DUI investigation was reported on the CAD, that he was left standing by himself for between 11 and 12 minutes with his hands cuffed behind his back, and that he did not need help walking. He claims Selman concocted and instructed a false DUI narrative to generate probable cause, because probable cause did not exist for Spain to search the vehicle at the time he opened the foil ball. Specifically, Defendant argues the recording of the

event demonstrates "the arrest for DUI is a cover up for a bad search because Spain arrested [D]efendant because he found Xanax bars after unlawfully unwrapping the foil[,]" and Selman and Spain concocted the DUI story "to fix the problem." [Doc. 29 at Page ID # 466].

In spite of Defendant's protest that the Government has failed to articulate the exception to the warrant requirement that it relies upon for the warrantless search of the foil ball, the Government has articulated that it is relying upon the community caretaking and automobile exceptions. Accordingly, there is no reason to address an exception based on a search incident to arrest—which was addressed by Defendant's filings—because the Government does not rely upon that exception. As Defendant has stated a valid Fifth Amendment argument as to one of his statements, I will address the Fourth Amendment and Fifth Amendment issues separately.

### A. Fourth Amendment Claims

There is no question that the search of the foil ball was conducted without a warrant; and, accordingly, is presumed unreasonable. When a criminal defendant seeks to suppress evidence obtained because a presumptively unreasonable warrantless search occurred in violation of his Fourth Amendment rights, the government bears the burden of demonstrating that the warrantless search was actually reasonable by a preponderance of the evidence. *See United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002) (holding the government bears the burden of proving the reasonableness of a warrantless search); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (holding "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"). Reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Maryland v. Buie*, 494 U.S. 325, 331 (1990). There are, however, recognized exceptions to the general rule that warrantless searches are presumed unreasonable

under the Fourth Amendment. One such exception is the community caretaking exception, and another is the automobile exception.

Defendant argues the standards applicable to a traffic stop,[14] and contends he had committed no traffic violation when encountered by Spain. The Government argues Spain's warrantless initial encounter with Defendant, including opening Defendant's car door, was justified by the community caretaking exception to the Fourth Amendment's warrant requirement. Defendant agreed during the hearing that the community caretaking exception applied to a point in this case and also acknowledged in his brief that, because traffic stops are fraught with danger to the police, courts have held "that asking motorists to step out of their vehicles is at most a minor inconvenience and is permitted." [Doc. 20 at Page ID # 59 (citing *Michigan v Long*, 463 U.S. 1032, 1047 (1983)].

Post-hearing, Defendant does not appear to dispute that Spain could (and did) properly initiate contact to determine if Defendant was unwell or in need of assistance. Nor does Defendant appear to continue to dispute that Spain could open the car door and ask Defendant to step out his vehicle under the community caretaking exception. Instead, he argues Spain's wellness check was completed before probable cause was developed for the warrantless search of

---

[14] As argued by Defendant, the United States Court of Appeals for the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that stopping an automobile is reasonable where there is probable cause to believe a traffic violation has occurred); *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (holding that reasonable suspicion standard is sufficient for ongoing traffic violation but not a completed misdemeanor). "So long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) (quoting *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005)).

his vehicle, including the foil ball. The Government mainly argues that, by the time the community caretaking exception no longer applied, Spain had developed probable cause for a warrantless search of the vehicle under the automobile exception, because Spain had probable cause to believe that Defendant had been in physical control of a motor vehicle while under the influence of drugs and that evidence of a narcotics crime would be located in the vehicle.

For context, I will first address the community caretaking exception, and then address the parties' main argument concerning the existence of probable cause under the automobile exception.

### 1. Community Caretaking Exception

The Supreme Court of the United States has held that police officers often "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). When a police officer is performing a community caretaking function, "rather than [a] traditional law-enforcement function[,]" an exception to the Fourth Amendment warrant requirement is recognized. *Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019) (quoting *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)).[15]

Application of the community caretaking exception necessitates careful consideration of the "'function performed by a government agent' when a search occurs." *Id.* (quoting

---

[15] The parties here, and courts generally, use the phrase "exception to the warrant requirement" when referring to circumstances in which a warrantless search is deemed reasonable/constitutional absent probable cause. While use of that phrase suggests that a warrant generally would be required, a search conducted under the community caretaking doctrine is independent of a criminal investigation so, logically, a warrant would not be required in the first instance. Regardless, as most courts and the parties have used the phrase, I will as well.

18

*Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009)) (cleaned up). While "the community caretaker exception does not provide the government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large," courts have also applied the exception to situations where "public safety is at risk." *Id.* (quoting *United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009)) (cleaned up).

Spain was dispatched to the Walmart parking lot, along with a fire truck and an ambulance, to check on a driver who reportedly appeared to be passed out. Spain rushed to the Walmart with his lights and siren activated and found a man passed out in a running vehicle that was parked crookedly across two parking spaces. When Spain knocked a few times on the driver's side window, Defendant did not stir. Spain could see that Defendant had a cigarette hanging from his lips and a lot of cash and a Nike bag in his hands and lap. To the extent it even remains in contention, I specifically find that Spain reasonably believed Defendant could be suffering from a medical emergency such as a cardiac arrest, stroke, drug overdose, or any number of other conditions that could cause a person to be nonresponsive while in control of a running automobile.

Defendant may be continuing to argue that, notwithstanding Spain's initial reasonable concern for Defendant's welfare, Spain's behavior in opening the car door and getting Defendant out of the car was unconstitutional. Again, I disagree. Under the undisputed evidence, Spain first attempted to rouse Defendant by knocking on the window and only opened the door when Defendant was unresponsive to not one, but at least two, knocks on the window. Moreover, the Sixth Circuit has held that an officer is not even required to knock on a vehicle window and wait for a response before opening the door when acting under the community caretaking exception.

19

*See United States v. Lewis*, 869 F.3d 460, 464 (6th Cir. 2017).[16]   Spain's action in opening the

car door and rousing Defendant was "totally divorced from the detection, investigation, or

acquisition of evidence relating to the violation of a criminal statute."   *Dombrowski*, 413 U.S. at

441.

As relevant here, the clear purpose of Spain's initial effort of opening the car door was the

welfare of the vehicle's occupant, Defendant.   There is no evidence to suggest that Spain's initial

action in opening the car door to attempt to rouse Defendant was taken with any traditional law

enforcement purpose in mind.   In addition, opening the car door represents a minimal intrusion

compared to the legitimate concern for Defendant's welfare.   As recently held by the Sixth

Circuit, "the community-caretaking exception is not limited to the least intrusive means of

protecting the public."   *United States v. Mason*, No. 21-3225, 2022 WL 853304, at *4 (6th Cir.

Mar. 23, 2022) (quoting *Lewis*, 869 F.3d at 464).

Defendant also initially argued the community caretaking doctrine is an exception to the

---

[16] In *Lewis*, police were called to a Walmart because a female shopper appeared intoxicated.
Police arrived on the scene and observed that the shopper appeared off-balance, was propping
herself up with a shopping cart, and was nodding off.   When they approached the shopper, they
asked her if someone was available to drive her home.   She stated her boyfriend could do so.
Officers then escorted the shopper to the parking lot to determine whether her boyfriend was
available to drive her home.   One of the officers looked in the driver's side window and observed
the boyfriend asleep on the passenger side.   *Lewis*, 869 F.3d at 461.   Another officer, without
knocking, opened the vehicle door.   Upon opening the door, the officer saw a baggy containing a
bluish substance that the officer thought might be marijuana or pills.   The bag turned out to
contain hundreds of illegal prescription drugs, and the boyfriend was charged with various drug-
possession-related offenses.   *Id.* at 462.   The boyfriend sought to suppress all evidence found in
the vehicle on the basis that it was the fruit of an illegal search.   The Sixth Circuit held that the
community caretaking exception applied because, when the officers approached the truck: (1) the
officers' sole purpose was to find the incapacitated shopper a ride home; (2) there was no evidence
that "the officers' action was taken with any traditional law-enforcement purpose that would make
the community care-taker exception inapplicable"; and (3) "given the community-caretaking
nature of the officers' action, any limited intrusion on Lewis' privacy from simply opening the
door was reasonable."   *Id.* at 463-64.

warrant requirement only if there is a reasonable likelihood that the community will sustain an injury if the officer does not act, citing *Washington*, 573 F.3d at 289, and *Saginaw*, 922 F.3d at 335, and further that the exception applies only if Spain acted with true immediacy [*see* Doc. 20]. To the extent Defendant continues to make such arguments, similar arguments have recently been rejected by the Sixth Circuit in *United States v. Greene*, No. 20-6316, 2021 WL 3199239, at *4 (6th Cir. July 29, 2021), *cert. denied,* 212 L. Ed. 2d 800, 142 S. Ct. 2744 (2022).[17]  Like the court in *Greene*, in this case I conclude that under the circumstances at hand, there was a potential risk of injury to Defendant had Spain not opened the driver's door and gotten Defendant out of the car to determine if Defendant required medical assistance and/or was safe to continue to operate his vehicle.  Spain "had legitimate reason to be concerned that Defendant's well-being was in jeopardy."  *Id.* at *4.  If Defendant "had overdosed on drugs, it would have been imperative for the officers to act quickly."  *Id.*  This community caretaking function/concern is exemplified by the dispatch of an ambulance and firetruck to the scene—at least up to the point they were

---

[17] In *Greene*, the defendant asserted that the district court's denial of his motion to suppress conflicted with cases in which the circuit had held that the community caretaking exception only applies if law enforcement's sole purpose for a warrantless search relates to its community caretaking role and only applies if the officer acted with "true immediacy."  *Greene*, 2021 WL 3199239, at *4.  While noting prior decisions holding that the applicability of the community caretaking exception hinges on whether an officer's delayed action would result in an injury or harm to the community, the circuit court held, based on the facts of that case, that the officers had legitimate reason to be concerned that Greene's well-being was in jeopardy given that, if he had overdosed on drugs, it would have been imperative for the officers to act quickly.  *Id.*

dismissed.[18]

Accordingly, I conclude Spain's initial warrantless opening of the vehicle door and getting Defendant out of the vehicle was completely reasonable under the community caretaking exception to the Fourth Amendment.

### B. The Automobile Exception

In general, the Fourth Amendment does not require a warrant for an automobile search when police have probable cause to believe the vehicle contains contraband or evidence of criminal activity. This exception to the warrant requirement—the automobile exception—results from both the reduced expectation of privacy associated with automobiles, which are highly regulated, and the inherent mobility of vehicles. *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (holding under the automobile exception, law enforcement officers may search a vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband or other

---

[18] Undoubtedly, the "community caretaking doctrine is not a blank check for government intrusions into individual liberties." *United States v. Fairrow*, No. 4:20-CR-00013-JHM, 2021 WL 5140946, at *4 (W.D. Ky. Nov. 3, 2021), *appeal dismissed,* No. 21-6097, 2022 WL 487953 (6th Cir. Jan. 10, 2022). However, there are situations where a community caretaking function could objectively "justif[y] a search or seizure if there are specific and articulable facts creating a public-safety need." *Id.* (quotation marks and citations omitted). Given the arguments, however, I will not address whether the foil packet could have been opened during the course of the caretaking function without running afoul of the Fourth Amendment. Although the Government mentions public safety issues created by intoxicated drivers, it does so only in the context of probable cause. The Government concedes that when Spain opened the foil packet, he was engaged in the detection, investigation, or acquisition of evidence relating to the violation a crime, not a caretaking function related to Defendant's wellbeing, so the Court need not address this issue further in the context of the community caretaking exception.

evidence of a crime.).[19]  The automobile exception requires nothing more, and in particular, it

does not require a time-based or travel-based exigency.  *Maryland v. Dyson*, 527 U.S. 465, 466-

67 (1999) (per curiam); *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011).

Indisputably, if the police have probable cause to search the entire automobile, the police

may also search all containers in the automobile for which there is probable cause to believe that

evidence may be found.  *Carter v. Parris*, 910 F.3d 835, 839 (6th Cir. 2018) (holding that although

the Fourth Amendment generally requires a warrant before performing a search, law enforcement

may search a vehicle and a lockbox in the vehicle without a warrant if they have probable cause

to believe that the vehicle contains contraband or evidence of a crime) (quoting *Galaviz*, 645 F.3d

---

[19] Given the intersection of community caretaking functions and automobiles, the Supreme Court has noted that police often encounter "recurring practical situations that result[ ] from the operation of motor vehicles and with which local police officers must deal every day," such as automobile accidents, unoccupied vehicles on public streets, or even abandoned vehicles.  *Dombrowski*, 413 U.S. at 446-47; *see also id*. at 439 ("One class of cases which constitutes at least a partial exception to this general rule is automobile searches.").  Recognizing this intersection, the Sixth Circuit has held that, given the expectation of privacy is diminished with respect to automobiles and because enforcement officers routinely encounter noncriminal situations involving automobiles, the community caretaking exception "has been principally applied to the warrantless searches of automobiles." *Lewis*, 869 F.3d at 463-64 (quoting *Taylor v. Mich. Dep't of Nat. Res*., 502 F.3d 452, 462 (6th Cir. 2007)).  As noted above, the Government does not contend Defendant's vehicle was searched as part of law enforcement's community caretaking function; but rather, because Spain had probable cause to search the vehicle.

at 355)), *cert. denied*, 139 S. Ct. 2703 (2019).[20]   Perhaps ironically in this case, although a warrant is generally required to search containers in the public, once the container is placed in an automobile, it may be searched based on probable cause to believe it contains contraband or evidence alone.  *California v. Acevedo*, 500 U.S. 565, 579-80 (1991).

The Government argues Spain had probable cause[21] to both detain Defendant and, as

---

[20] "If there is probable cause to believe a vehicle contains evidence of criminal activity," officers may, without a warrant, search "any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)).  The scope of a warrantless search based on probable cause is "no narrower–and no broader–than the scope of a search authorized by a warrant supported by probable cause."  *Ross*, 456 U.S. at 823.  "The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted.  Rather, it is defined by the object of the search and the places in which there is probable cause to believe that [it] may be found."  *Id*. at 824.  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  *Id*. at 825. *Accord*, *e.g.*, *Acevedo*, 500 U.S. at 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."); *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir. 1986) ("Once the contraband was found, [the officer] had every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband."); *Carter v. Paris*, 910 F.3d 835, 840 (6th Cir. 2018) ("The fact that the lockbox was a locked container inside the car also makes no difference."); *United States v. Collazo*, 818 F.3d 247, 259 (6th Cir. 2016) (finding probable cause for a vehicle search where driver acted "defeated" and stated there was something illegal in her purse); *United States v. Ross*, 300 F. App'x 386, 388 (6th Cir. 2008) (probable cause existed when passenger handed officer bags containing marijuana from inside the vehicle).  Defendant agrees that if there was probable cause for a warrantless search of his vehicle, which he hotly disputes, then the scope of the search would include the foil.

[21] As very recently held, "[c]ertainly officers may detain a driver for things like questioning or field-sobriety tests if they have a reasonable suspicion that the driver is, for example, operating a vehicle under the influence of drugs.  *Klaver v. Hamilton County, et al*. Nos. 22-5083/5084, 2022 WL 16647970, at *6 (6th Cir. Nov. 3, 2022) (citing *United States v. Guajardo*, 388 F. App'x 483, 488-89 (6th Cir. 2010); *Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012)); *see also United States v. Overton*, 600 F. App'x 303, 310-11 (6th Cir. 2014) (holding seizure was reasonable when EMS personnel detained a man, who had been unconscious when they arrived on scene, for thirty seconds out of concern for his medical wellbeing).  As probable cause is a more strenuous standard, although still not a particularly high standard for a traffic violation stop, this report and recommendation will not separately address whether Spain had a reasonable and articulable suspicion for the stop.

24

relevant to the remining issue, to open the foil ball pursuant to the automobile exception the minute Defendant got out of his car.   I agree.

First, by sitting in the driver's seat with the engine running, Defendant gave Spain probable cause to believe that Defendant satisfied the element of "be[ing] in physical control of any automobile" for purposes of the DUI Statute.   *See State v. Lawrence*, 849 S.W.2d 761, 765 (Tenn. 1993) (holding that defendant "was in physical control of his automobile within the meaning of T.C.A. § 55-10-401(a)" where he "was inside of the vehicle, behind the wheel, and had possession of the keys," and "[h]e was alone in the truck and no one else was in the area.").   Defendant does not argue otherwise and, as the Government points out, in *Lawrence*, the vehicle was not even running.   *Id*. at 762, 765 (holding "[i]t is our opinion that the Legislature, in making it a crime to be in physical control of an automobile while under the influence of an intoxicant, 'intended to enable the drunken driver to be apprehended before he strikes.'" (citation omitted)).

Second, and the hotly contested issue, is whether Spain had probable cause to believe contraband or evidence of criminal activity—either that (1) Defendant was under the influence of any narcotic that impaired his ability to safely operate a vehicle by depriving Defendant of his clearness of mind and control he would otherwise possess in violation of the DUI Statute or (2) Defendant possessed a controlled substance without a valid prescription in violation of Tenn. Code Ann. § 39-17-418(a)—would be found in the vehicle.   Of note, Defendant does not argue a lack of probable cause for his arrest once the foil ball was searched, *if* probable cause is found to have existed when the foil ball was initially opened.

Unquestionably, the Government's probable cause arguments must be viewed in light of only what Spain knew when he searched Defendant's vehicle (or in this case a container in the vehicle—the foil ball).   *See Terry*, 392 U.S. at 21-22.   However, as noted above, "a pattern of

suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'" *United States v. Knox,* 839 F.2d 285, 290 (6th Cir. 1988) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)). As such, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (quotation marks and citation omitted).

To recite just the undisputed facts in this case is nearly to decide it in my opinion. Spain knew Defendant was found unresponsive at the steering wheel of a still-running, haphazardly parked vehicle in a Walmart parking lot after a report was phoned into dispatch that a man was possibly passed out in the vehicle. Spain could see Defendant had an unlit cigarette hanging from his mouth. Spain also saw Defendant had a Nike bag and a large pile of money in multiple denominations in his lap and hands. Spain knew he had to open the vehicle door to awake Defendant even after knocking on the window more than once in an attempt to rouse him. Once Spain opened the door and roused Defendant, Spain saw a large torch-style lighter in the center console and an aluminum foil packet in the driver's side door. Spain's training and experience indicated these observations—the money, bag, lighter, and foil—frequently indicated illegal drug use.

Defendant does not contest the above noted observations; instead, he argues it would have been more reasonable for Spain to think Defendant was simply asleep and the items he observed were for innocent uses/purposes. But probable cause does not require officers to rule out possible innocent explanations for suspicious facts. *See Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) (holding "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."). Also, and as the phrase

26

suggests, "probable cause concerns probabilities, not certainties."  *United States v. Lanier*, 636 F.3d 228, 234 (6th Cir. 2011).   So, again, what remains to be decided is whether Spain had probable cause to believe contraband or evidence of a crime would be found in Defendant's vehicle when he opened the foil ball in light of his own experience and training, which allowed him to make inferences from, and deductions about, the cumulative information available to him at the time.

I find that based on the undisputed facts—viewed through the lens of Spain's experience—Spain had probable cause for a warrantless search of the vehicle, including his search of the foil ball, under the time-honored automobile exception.   Considering only his initial observations of Defendant, I find probable cause to search the entire vehicle existed the moment Spain saw the torch lighter and foil ball.   As mentioned, Spain made additional observations before he conducted the search—but those additional observations are vehemently contested.   For example, Spain testified he also noticed Defendant's eyes were glassy/glossy with constricted pupils and he thought Defendant was swaying and difficult to understand.   To the extent this testimony is credible, these additional observations, undoubtedly, are more clues that Defendant had used illegal narcotics or was impaired and they also support probable cause to believe evidence of a crime would be found in the vehicle if credited.   Even disregarding these additional observations, however, I still find probable cause to reasonably believe the car would contain evidence of a crime.

Moreover, I find Spain's testimony—that he also noticed Defendant's eyes were glassy/glossy with constricted pupils and thought Defendant was swaying and difficult to understand—credible, which simply bolsters the existing probable cause.   That Spain chose not to first (or ever) conduct field sobriety tests does not change the result, as he already had probable

27

cause to believe that the vehicle contained evidence of DUI and narcotics-related crimes. *See United States v. Rolley*, No. 5:17-CR-00007-TBR, 2017 WL 2312697, at *2 (W.D. Ky. May 26, 2017) (finding probable cause despite officer's decision not to administer field sobriety test, noting that "the failure or refusal of a field sobriety test is not an absolute prerequisite to a DUI arrest. Instead, the proper inquiry is whether, under the totality of the circumstances, a prudent officer would have believed [the defendant] had driven under the influence of narcotics.").

In short, just based on Spain's uncontested observations, I find it was entirely reasonable for Spain to conclude that Defendant's vehicle possessed contraband and other evidence of Defendant's suspected violation of DUI and other narcotics laws and that he had probable cause to engage in a warrantless search of the vehicle and containers found therein under the automobile exception. *See United States v. Guy*, 1 F. App'x 410, 2001 WL 45486, *1 (6th Cir. 2001) (holding there was probable cause to believe contraband would be found in car when defendant was parked in an area on the side of the road, asleep in the driver's seat with the engine running and a "crank pipe" in his hands); *Rolley*, 2017 WL 2312697, at *2 (holding officer "had probable cause to believe [the defendant] was under the influence" because he observed the defendant "asleep on the side of the interstate, in a car that was still running, sitting on a used crack cocaine or methamphetamine pipe[, and w]hen the two spoke, [the defendant] was confused and slurred his speech."); *United States v. Allen*, No. 4:08-CR-40, 2009 WL 803112 at *4 (E.D. Tenn. Mar. 25, 2009) (holding officer had probable cause to arrest the defendant who was asleep in a running car in a public parking lot where officer smelled alcohol and saw other signs of intoxication upon opening the vehicle door) ("Allen I"); *see also United States v. Allen*, No. 4:08-cr-40, 2009 WL 3297286, at *1 (E.D. Tenn. Oct. 13, 2009) (affirming decision in Allen I in light of *Gant*).

I acknowledge that none of the above cited cases are exactly on point and, as argued by

Defendant, include more direct observations of intoxicants among other differences. Guy was discovered asleep in the driver's seat of a running vehicle with a crank pipe in his hand in plain view, officers had to shake him for about a minute and a half before he awoke, officers found methamphetamine in his pocket during a pat down, and prior to searching the vehicle he was informed he was under arrest for possession of drug paraphernalia and DUI. *Guy*, 1 F. App'x at 411. In *Allen*, the defendant had a strong odor of alcohol and officers observed a cup of what appeared to be whiskey. 2009 WL 803112, at *1. Furthermore, this Court found probable cause to arrest defendant and search his vehicle pursuant to arrest, so the Court did not address the automobile exception based on the circumstances of that case. *Allen I*, No. 4:08-CR-40, 2009 WL 803112 at *4. Rolley was also found asleep behind the wheel of a running vehicle and, in plain view in the vehicle by Rolley's leg, was a glass pipe with a burnt white substance, indicating recent drug use. Prior to the vehicle search, methamphetamine was found on Rolley's person and he was informed he was under arrest. The court held the officer had probable cause to arrest Rolley for possessing drug paraphernalia and search his person, and expressly presumed that if the arrest was held to be valid, the subsequent search of the vehicle was permissible pursuant to the arrest. *Rolley*, 2017 WL 2312697, at *2-3.

Defendant argues none of the above cases, all of which were cited by the Government, indicate Spain had probable cause to search Defendant's vehicle; rather they support his position because unlike in the above cases, Spain observed no "direct evidence of drug use in plain view in the vehicle[.]" [Doc. 29 at Page ID # 476 (citing *United States v. Reagan*, 713 F. Supp. 2d 724, 733 n.7 (E.D. Tenn. 2010) (listing "observations of an open container of alcohol in plain view inside the passenger compartment" and "the smell of alcohol emanating from within the passenger compartment" as two of several factors that would justify a reasonable belief that evidence of DUI

would be found in a vehicle)].   Defendant argues that because no direct evidence of drug use (such as drugs/alcohol/odors/pipes or other paraphernalia) was observable in plain view in Defendant's vehicle, and the Government has failed to identify a case that did not involve such evidence, the Government has not met its burden to prove Spain had probable cause to believe Defendant's vehicle held evidence of a crime before he searched the foil ball.

The Government counters that Defendant's argument is misplaced because Spain testified he saw a large blowtorch lighter immediately to Defendant's right and a foil packet immediately to Defendant's left in the vehicle and, that based on his training and experience—including an estimated five previous drug-investigation incidents where he saw such items—those items often are associated with illegal drug use.   The Government argues the blowtorch combined with the foil is analogous to the cup of whiskey in *Allen*, the pipe in *Guy*, or the pipe with burnt white residue in *Rolley*.

Defendant rejects the Government's argument that the blowtorch and foil are equivalent drug paraphernalia because (1) the torch lighter was "really a standard lighter" that Spain did not "even know was functional;" and (2) "even if the ball of foil could be suspicious (it is not—it just as easily could have been a piece of trash from a hamburger wrapper), that is a far cry from drug paraphernalia in plain view or a suspected cup of alcohol combined with alcohol's plain spell." [Doc. 29 at Page ID # 477].   In the end, and after much briefing and evidence, Defendant asks the Court to hold that, because he had "nothing in plain view in the vehicle that directly confirmed the use of an illegal substance inside the vehicle," [*id*.], no probable cause existed to search the vehicle at the time Spain opened the foil ball.   I disagree and believe that the uncontested observations detailed above establish Spain did not violate Defendant's Fourth Amendment rights because Spain had probable cause to believe Defendant's vehicle contained contraband or evidence of

criminal activity—that is a violation of the DUI Statute or other narcotics laws—so the search of Defendant's vehicle, including the foil ball, falls squarely under the automobile exception.

### C. Spain's Credibility

Although it is not necessary to address the additional observations that Spain testified to in order to find probable cause, I will briefly do so for the record. Defendant questions Spain's motives and credibility, and accuses Spain and Selman of conspiring to cover up a violation of Defendant's constitutional rights. The proof does not support such extreme allegations.

Defendant complains about the "curiously absent [] ubiquitous failure of field sobriety tests, eye gaze nystagmus test or discussion of alcohol" [Doc. 21 at Page ID # 71-72], and about Selman's advice to Spain regarding same. Spain was not an extremely experienced law enforcement officer at the time of the search, but he had already seen similar torch lighters and foil containers in five illegal drug-related incidents. Even before the alleged coaching, Spain told Selman that Defendant seemed "out of it." As argued by the Government, Selman's recorded actions appeared to be in the nature of advising a less-experienced officer to support and document his reason for deciding not to conduct field sobriety tests before opening the foil ball (or at any time), and not a conspiracy to coverup a Fourth Amendment violation as claimed by Defendant. While it appears a reason Selman suggested in his discussion with Spain that the field sobriety tests were not done—Defendant's safety—was not a significant factor in Spain's election to forego conducting field sobriety tests, the conversation between Selman and Spain does not undermine Spain's legitimate observations and conclusion that he had probable cause for an automobile search at the time he conducted the search.

I also acknowledge Defendant's complaints that Spain's version of events is incredible because his Incident Report (Defendant's Exhibit 2) is allegedly rote boilerplate and does not

correctly describe the sequence of events concerning the aluminum foil. He notes the CAD does not mention anything relative to a DUI investigation and that Spain's request for backup noted only "narcotics" and changed the call from "unconscious person" to "NARC-Narcotics violation" with no mention of a DUI offense. I find these arguments do not undermine Spain's credibility given his explanation for each and what I consider to be sufficient probable cause even prior to Spain's consideration of Defendant's eyes, swaying and speech.

Even under rigorous cross examination, Spain's testimony was mostly coherent, facially plausible, generally consistent, and not significantly contradicted by extrinsic evidence. Spain's demeanor, tone, and actions during the recorded events and the suppression hearing do not undermine his credibility or suggest fabrication. *See Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985). That Defendant was exhibiting signs of impairment is also supported by the toxicology report, the video evidence, and Defendant's own post-Miranda statements about how he came to find himself being awaken by Spain in a parking lot:

20:39:14    An officer asks Defendant, "What kind of drugs did you do to pass out in the car?" Defendant replies, "I don't know, I was with them girls, dude, and next thing I know I was at their house and I woke up here. He (nodding his head toward Spain) woke me up."

20:43:43    Defendant states, "I was so f**ked-up last night with these girls . . .

**D. Alternate Arguments**

The Government makes an alternative argument under *Herring v. United States*, 555 U.S.

135, 143 (2009)[22] in the event the Court finds a violation of the Fourth Amendment. As it is not recommended that a constitutional violation be found, it is not necessary to address this alternative argument, and I decline to do so.

Accordingly, for the reason stated above, I recommend that all aspects of Defendant's motion to suppress based on an alleged violation of his Fourth Amendment rights be denied.

### E. Miranda Advisement and Waiver

The final issue for resolution regards Defendant's incriminating statements. He argues some statements were given in violation of Miranda and all were fruit of the poisonous tree due to the alleged Fourth Amendment violations. As no Fourth Amendment violation has been found, it is only necessary to address any remaining Miranda issues.[23]

---

[22] In *Herring*, the Supreme Court noted that exclusion of evidence, even in the face of a constitutional violation, should be the "last resort, not [the] first impulse." 555 U.S. at 140. "[T]he abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional." *Id.* at 143. "Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). "The rule's sole purpose . . . is to deter future Fourth Amendment violations." *Id.* at 236-37. Thus, even if a constitutional violation occurs, it does not necessarily mean the exclusionary rule applies.

[23] Defendant does not challenge whether Spain gave him a proper Miranda warning prior to his interrogation by the investigator and ensuing incriminating responses. Normally, this would not end the inquiry, however, because a defendant's "statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)) ("Statements made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights 'voluntarily, knowingly, and intelligently.'"). So, Defendant could relinquish his Miranda rights only (1) if his waiver was voluntary—i.e., "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) if it was knowing and intelligent—i.e., "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. 564, 573 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Defendant does not dispute he gave a valid Miranda waiver.

The following potentially incriminating statement is the only one identified to have taken place during custodial interrogation before Miranda warnings were given and Defendant validly waived his Miranda rights:

> 20:00:07    Spain asks, "What were those?"
>
> 20:00:08    Defendant responds, "Xanax bars."

The Government acknowledges it cannot use this statement. However, for the sake of clarity, I recommend granting Defendant's motion with respect to suppressing the above statement.

As to the remaining, post-Miranda waiver statements, the parties have agreed Defendant understood and voluntarily waived his Miranda rights prior to making those incriminating statements during custodial interrogation. Defendant has offered no basis for excluding such post-Mirandized statements—other than his rejected Fourth Amendment claims.

In addition, Defendant has pointed to no improper coercive police activity. *See United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000) (admitting confession where defendant "failed to advance any evidence of coercive police activity"). "Absent coercion," the Sixth Circuit has "held that a waiver was voluntary even where the defendant was under the influence of 'an intoxicating medication'" or had been "drinking heavily." *United States v. Dunn*, 269 F. App'x 567, 572 (6th Cir. 2008) (citations omitted). Even "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). Accordingly, I recommend denying Defendant's motion with respect to suppressing his post-Miranda statements.

34

One final point: the Government also says it will rely on "any" incriminating statements Defendant made before Spain grasped Defendant's arm and led him to the patrol car to be handcuffed, because Defendant "was merely detained pursuant to a *Terry* stop and therefore was not in custody for purposes of triggering the *Miranda* requirement." [Doc. 18 at Page ID # 43 n.2 (citations omitted)]. While the Government argues any statements Defendant made in the roughly two minutes between the time he gained consciousness and the time he was taken into custody (i.e., taken by the arm and led away from his car to be handcuffed) were not subject to Miranda, they have identified no incriminating statements. Nor has Defendant identified any custodial interrogation that took place during this time. Under these circumstances, any recommendation would be based on speculation, and I decline to do so.

Accordingly, for the reason stated above, I recommend that Defendant's motion to suppress based on an alleged violation of his Fifth Amendment rights be granted in part so the following statement is suppressed and denied in all other aspects:

      20:00:07        Spain asks, "What were those?"

      20:00:08        Defendant responds, "Xanax bars."

## IV.    CONCLUSION

For the reasons stated above, I **RECOMMEND**[24] that Defendant's motion to suppress

[Doc. 15] be **DENIED IN PART AND GRANTED IN PART** as set forth herein.

ENTER:

s/*Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[24] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party.   Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure.   Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).   The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.   *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).   Only specific objections are reserved for appellate review.   *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

36